[No. G003648. Fourth Dist., Div. Three. Feb. 18, 1987.]

In re JAMES T., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff
and Respondent, v.
DOLORES T., Defendant and Appellant.

**COUNSEL**

Dana Michael Korn, under appointment by the Court of Appeal, for Defendant and Appellant.

Adrian Kuyper, County Counsel, and Wanda S. Florence, Deputy County Counsel, for Plaintiff and Respondent.

John F. M. Rodriguez, under appointment by the Court of Appeal, for Minor.

OPINION

WALLIN, J.—Delores T. (Mother) appeals from a Welfare and Institutions Code section 300 jurisdictional order declaring her then 16-year-old son, James, a dependent child of the court and the dispositional order placing him with his sister and brother-in-law in Crestline. She contends there was not clear and convincing evidence James was suffering the statutorily prescribed severe emotional damage to justify taking him from her physical custody. (Welf. & Inst. Code, § 361, subd. (b)(3).) She is correct and, therefore, the dispositional order of the juvenile court must be reversed. However, as there was substantial evidence to sustain the jurisdictional finding, the section 300 order is affirmed and the matter is remanded to the juvenile court for a new dispositional hearing.

James is the youngest of five siblings. His father abandoned him when he was two and one-half and Mother has been his sole source of support, although financially she faced many challenges as a single parent. She complained of her financial problems around James, often attributing her plight to his father. In spite of a rather splotchy employment record, she managed to feed and clothe him. She also helped him with school and arranged for him to participate in such extracurricular activities as golf and soccer.

There were other problems within the family. Mother verbally berated James's three oldest half-siblings who had long before moved away from home. James's older sister, Jennifer, had many conflicts during adolescence with Mother. The scars remained long after she moved away from home and later married. By the time James was 16, Jennifer and Mother were not speaking.

Nevertheless, James was an extremely bright, articulate young man. Scholastically he had always been a high achiever. He not only participated in extracurricular sports activities, but when Mother was unemployed, he did

gardening jobs on weekends and contributed part of his earnings to the family.

During the spring and summer of 1985 the family situation deteriorated. James and Mother had been living in a single room at the Ambassador Inn. In April, Mother was fired and they were forced to live off her small savings and governmental assistance. James sought counseling because the problems at home left him "shaken up in his head." He felt he lacked space and freedom and that Mother was "monetarily unstable." Mother's statements about his father were troublesome, making him feel "mentally confused."

Several specific incidents occurring during this time upset James. Once he was leaving to go fishing when Mother demeaned him by implying he was lazy for failing to hang up his laundry. On another occasion, she badgered him for missing work by calling him a "rotten kid." The tension escalated until Jennifer and her husband came over to talk to James about his problems. Mother held James in the room to prevent him from talking to them and called the police. Finally Mother agreed James could temporarily reside with his best friend's family.

Mother took a job caring for an elderly man which required living in his Newport Beach home. Once James expressed his unwillingness to move to Newport, she did not pursue arrangements for him to reside with her. She left the Newport position after three weeks and obtained employment at a mortgage company.

James lived for two and one-half months with the family friends, whom he had known for approximately eight years. Mother gave the family some money for his recreation and support. However, when one of their own children moved back home, they no longer had room for James, and he was taken to the county juvenile facility for abused and neglected children.

Two days later a petition to declare him a dependent child was filed. (Welf. & Inst. Code, § 300, subd. (a).) It alleged: Mother allowed James to reside with unrelated adult caretakers who could no longer provide a home for him, Mother had taken employment as a live-in attendant where James could not reside with her, she was unable to provide the necessities of life for him, and James refused to reside with her even if she had a home due to past severe conflicts between himself, his mother, and Jennifer.

A social services report was received by the court at the jurisdictional hearing. The social worker recommended James be allowed to reside with Jennifer and her husband. They lived in a two-bedroom cabin in Crestline and would provide James with his own room while he finished high school.

The social worker felt the minor's preference should be given substantial weight due to his age and model behavior. Mother's shaky background, including her financial as well as emotional problems, militated against compelling James to reside with her. The social worker concluded placement with these willing family members was preferable to Mother's desire to place James in a local foster home. James was declared a dependent of the juvenile court and was placed temporarily in Jennifer's home.

At the dispositional hearing in mid-December, a supplemental report informed the court James had adjusted well and recommended the same placement be continued. A clinical psychologist testified it would be detrimental to James to return him to his mother's custody because James felt he was serving Mother more than himself, he was having difficulty communicating with her, and he did not think he had enough freedom. Mother testified she was now able to financially provide for James as she was then gainfully employed and was purchasing a two-bedroom condominium in Garden Grove.

The court found there was a substantial danger to the emotional health of the minor if he was returned to his mother (Welf. & Inst. Code, § 361, subd. (b)(3)) and the minor's mental health could only be protected by removing him from Mother's physical custody (Welf. & Inst. Code, § 361, subd. (c)). Thereafter, the court also found the award of custody to Mother would be detrimental to James and the award to a nonparent was required to serve James's best interests. (Civ. Code, § 4600.)

## I

Mother attacks the sufficiency of the evidence to support both the jurisdictional and dispositional orders. ■ The allegations in a dependency petition must be proved by a preponderance of the evidence. (Welf. & Inst. Code, § 355; *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1112-1113 [200 Cal.Rptr. 789].) ■ The Department of Social Services met this burden and substantial evidence supported the dependency finding. (Welf. & Inst. Code, § 300, subd. (a).) When James was taken into protective custody, he was residing with a family who no longer had room for him. Mother had been evicted from her motel room and was residing in the home of an elderly man for whom she was caring. The record is unclear regarding Mother's living arrangements at the time of the jurisdictional hearing, although she did testify James could reside with her at the end of the fall semester. James testified to the severe conflicts he was having with Mother and the ineffectiveness of his efforts to obtain family counseling. Moreover, the psychologist's testimony alone constituted substantial evidence of the lack of parental care. Hence, the jurisdictional order must be affirmed.

## II

The burden of proof is substantially greater to remove a child from its parent at the dispositional phase of the dependency proceedings. (*In re Cheryl H., supra,* 153 Cal.App.3d at p. 1113.) Nevertheless, county counsel argues there was clear and convincing proof "[t]he minor [was] suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, and there [were] no reasonable means by which the minor's emotional health [could have been] protected without removing the minor from the physical custody of his . . . parent or guardian." (Welf. & Inst. Code, § 361, subd. (b)(3).) However, even James concedes the insufficiency of the evidence to sustain the 361, subdivision (b) finding.

A parent's right to the care, custody and management of a child is a fundamental liberty interest protected by the federal constitution. (*Stanosky* v. *Kramer* (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599, 606, 102 S.Ct. 1388].) "Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood." (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) "In furtherance of these principles, the courts have imposed a standard of *clear and convincing* proof of parental inability to provide proper care for the child and resulting detriment to the child if it remains with the parent, before custody can be awarded to a nonparent." (*In re Jeanette S.* (1979) 94 Cal.App.3d 52, 60 [156 Cal.Rptr. 262].)

In *Jeanette S.,* the dispositional order placing the minor in the custody of the Department of Human Services was reversed based on proof much clearer and more convincing than the proof offered here. Jeanette, age 5, had been residing with her mother, three dogs, and two cats in filthy conditions. There were animal feces in various rooms, the house smelled of urine, there was spoiled food on the stove, and she was frequently very dirty when she went to school. On occasion, her mother failed to prepare meals and often was not home when she came home from school.

On these facts, the court found there were reasonable alternatives available before awarding custody to the department. The juvenile court could have returned the child to her mother under stringent conditions assuring her physical environment would be properly maintained. The child could have been placed with her father, even though he had a serious drinking problem and an unstable employment record, was dependent upon welfare services, offered very crowded living conditions, and had been arrested for child molestation. If the evidence received in *Jeanette S.* did not constitute the clear and convincing proof necessary to remove young Jeanette from her

parents, then the much less egregious circumstances described by James are also insufficient.

Mother's fundamental right to retain custody of James is also expressly protected by section 361, subdivision (b). "No dependent child shall be taken from the physical custody of his or her parents ... with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence of any of the following: . . . ." (Welf. & Inst. Code, § 361.) The five subsections that follow include only extreme cases of parental abuse or neglect. Hence, section 361 imposes an even heavier burden of proof to overcome a parent's fundamental right to custody.

There was no evidence the alleged conflicts 16-year-old James experienced with Mother resulted in extreme anxiety, depression, withdrawal, or untoward aggressive behavior. (Welf. & Inst. Code, § 361, subd. (b)(3).) He expressed the doubts, dissatisfaction, and confusion echoed universally by adolescents. Unfortunately, his unhappiness was compounded by Mother's economic instability and the lingering animosity she harbored toward James's father. However, the composite of these facts falls far short of the statutorily defined cases justifying state intervention to sever, if even temporarily, the parent-child relationship.

The trial court also failed to consider less drastic measures. The court's finding that no reasonable means existed to protect James's health other than removal from his mother's custody is not supported by the record. The circumstances were far from urgent and no attempts had been made to assist family unification. Again we point to *In re Jeanette S., supra,* 94 Cal.App.3d at pages 60-61, by way of contrast. The court there devised expedient means of monitoring placement with either parent as reasonable alternatives to removal. Here, no comparable steps were taken nor was their absence adequately explained.

### III

The much more difficult question presented is whether Civil Code section 4600 can be used as an alternative basis to Welfare and Institutions Code section 361 justifying James's placement with a nonparent. Section 4600 states: "(c) Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." Here there was substantial evidence to support a section 4600 finding but not a section 361 finding.

The court expressly found it was in James's best interest to reside with Jennifer and it would be detrimental to return him to Mother. This finding was supported by the Department of Social Service reports and the testimony of the clinical psychologist. Therefore, we must decide if section 4600 of the Civil Code can be used to dilute the stringent prerequisites set forth in section 361 of the Welfare and Institutions Code.

Prior to enactment of section 361, section 4600 was used to give preference to placement of minors with their parents. (*In re B.G.* (1974) 11 Cal.3d 679, 695 [114 Cal.Rptr. 444, 523 P.2d 244].) Since the language of section 4600 applies to all proceedings involving custody, it has been used in many contexts outside the Family Law Act including juvenile court proceedings. (*Id.,* at pp. 695-696.) The court cannot merely find that placement with a nonparent is in the minor's best interest without the more specific determination that an award to a parent would be detrimental to the child.

■ Section 4600 is applicable in Civil Code section 232 proceedings to terminate parental rights. (*In re Carmaleta B., supra,* 21 Cal.3d 482, 495; *In re B.J. B.* (1986) 185 Cal.App.3d 1201, 1205 [230 Cal.Rptr. 332].) It safeguards parental rights by assuring a child will be awarded to a nonparent only if an award to the parent would be detrimental to the minor. ■ Can a court place a minor with a nonparent based, not on the extreme circumstances mandated by section 361, but on the less rigid section 4600 criteria?

One court has acknowledged the less rigorous requirements under section 4600 and managed to justify its application in lieu of section 361. (*In re Angelica M.* (1985) 170 Cal.App.3d 210 [216 Cal.Rptr. 18].) In *Angelica,* the minor had been removed from the custody of the mother and declared a dependent of the court. She was temporarily placed with her maternal grandparents, who battled with the father for her permanent placement. The court held section 361 "only applies to taking a child from the *physical custody* of a parent. It contains no language making it applicable to a placement dispute as between a noncustodial parent and a nonparent." (*Id.,* at p. 214.) Since Mother had custody of James and he lived continuously with her until their mutual agreement allowing him a short respite with his best friend's family, the *Angelica* noncustodial parent exception does not apply.

The language of section 361 is both clear and specific. In Welfare and Institutions Code section 300 proceedings a child is not to be removed from its parents unless there is clear and convincing evidence of one of the enumerated extreme cases. Since enactment of section 361, no authority exists for relying on Civil Code section 4600, rather than Welfare and Institutions Code section 361, to remove a minor from a custodial parent at the dispositional hearing. Section 361 embodies legislative solicitude for parental rights.

This statutorily constructed barrier to state intervention into the parent child relationship should not be corroded by allowing the juvenile court to opt for the Civil Code section 4600 detriment/best interest test when there is insufficient evidence of any of the more specific section 361 criteria.

### IV

It is now over a year since the court made its dispositional order. James will be 18 in less than five months, and the issues raised here will become moot. Nevertheless, the case must be remanded to the juvenile court for a new dispositional hearing and that court must now consider the changed circumstances the previous placement has caused. Although removal of 16-year-old James from Mother was erroneous as a matter of law, he has now lived with his sister and brother-in-law for nearly a year and one-half and his graduation from high school is imminent. Perhaps Mother, sensitive to James's present needs, will realize removal from his present home prior to graduation would be detrimental. Moreover, due to his age and maturity, she may be amenable to his emancipation (Civ. Code, § 60 et seq.). If not, he may be able to achieve his objectives by establishing a guardianship where, even if Mother objects, the less rigorous standard of Civil Code section 4600 would apply. (Prob. Code, § 1500 et seq.)

The jurisdictional order is affirmed. The dispositional order is reversed and the case is remanded for another dispositional hearing.

Trotter, P. J., and Crosby, J., concurred.